Next case, Transverse v. Iowa Wireless, and Ms. Powell, when you're ready. May it please the Court, Sidney Powell for Appellant I, Wireless. Despite its initial apparent complexity, Transverse's case distills to the vaporware as empty as its bleep software was. Judgment must be reversed for Iowa Wireless as a matter of law. Once Transverse jettisoned its OpenTAP software that provided the user interface for its product, which is what it sold to IWS, it had no software. The district court recognized and Transverse admitted that they had no actual product that ever worked. The company had never made a profit. In fact, they had lost in excess of $26 million over their entire lifetime. That fact alone under this Court's decision in Teletron precludes any award of lost profits because they're too vague and uncertain to be awarded in any way, shape, or form. There was never any code or confidential information in any of the documents that Iowa Wireless showed to IDI when Iowa Wireless realized that Transverse was not going to be able to perform and had repeatedly failed to produce any working product. Is there a jury finding that is adverse to that last point or a finding by the court that's adverse to that point about whether there's something that is code as opposed to just your client's own information that would be helpful in constructing a system? No. In fact, the court found that there was nothing confidential that was marked, and it's undisputed there was no software code in the documents themselves. Okay, so you don't have to overcome that hurdle on that point. No, and on top of that, none of the case should have gone to the jury because everything depended on the confidential, the nondisclosure agreement, and there was no information marked confidential, and the issues were purely legal. There was a jury waiver provision. The jury did find that Iowa breached the contract by terminating the contract, and they heard both sides of the argument. They heard your side that they didn't perform by the deadline, and they heard the other side that you terminated, so we've got a pretty firm jury finding on the termination. None of the case, however, should have gone to the jury because of the jury waiver provision in the nondisclosure agreement. What about just on the breach of contract by termination? That was all dependent on and infected with information that came only under the confidentiality clause. Well, I thought it was just nonperformance was the basic reason for the jury verdict on the termination. No, the only—they alleged it as termination, but it all depended—all of their claims depended solely on the three documents that they said should never have been disclosed, and so all of those came within the confidentiality clause and the jury waiver termination, and none of it was confidential. There was no source code, and most importantly, there was never a product. We repeatedly asked Judge Yackel to decide all of these issues as a matter of law before they went to the jury instead of letting it go to the jury. Pre-trial, we asked him to make all of the terminations. There was not even a contract because transverse actually proved that there was never more than an agreement to agree. That's what's very puzzling to me. If they're—I mean, I'm going to ask them about that because if that's their theory is that, oh, all this stuff is going—the terms are all going to be filled in later, then that's not a contract at all, and we don't even get to whether the jury verdict is supported or not. Right. I mean, the very first—there are three different reasons that require reversal of this case in total. The first is they proved themselves there was only an agreement to agree. That was their only theory around which they could excuse their own failure to ever produce a product. They literally and repeatedly told the jury and the court they had no obligation to perform whatsoever under this contract. And we've got real— That's very confusing to me. So their position is that your client had to continue to pay them into infinity even if they never produced anything that you produced? It is literally that absurd. And as proof of that, you need only look at the fact that the court awarded lost profit damages of $10 million for the future. In the face of a clear termination letter and an undisputed agreement that there was no bleep product. There was never a working bleep. That's undisputed. Because once they took out the OpenTAP software because they refused to pay a licensing fee to the company that had provided the part of their system on which their entire software depended, they tried to reverse engineer it themselves and couldn't do that. And if you'll look at our record excerpts, I think it's 15, 19, 20, and 21, you'll see repeated admissions in their own emails that we simply do not know the full detailed scope of bleep because we have not yet determined what that is. We don't know how it's all going to work together because we have not designed it at all. IWS Exhibit 314, an email by Cleveland Howitt of Transverse in January 2010. They had no product. They never had a product. They deliberately misled us about the existence of their product. He has one statement where he says, you know, we've been found out and that's why we've lost all credibility. Which should we do? I guess I think I know which one you'll tell me. Yes. Should we reverse the verdict to a take nothing judgment completely and send it back for us to get an award of attorney's fees from the district court? Well, there was a supply contract signed, wasn't there? There's a contract signed, but it lacks material terms like the requirement of any date by which anything is to be performed. And a second reason for reversing on the contract is they never tendered performance. Not only did they never tender performance, they admitted they could not perform. Even after a 30-day grace period that we gave them, they had no working software. To this date, they have no working software. To this date, they have never made a profit. You could reverse it entirely just on the lost profits issue and not even reach the contract issues. Counsel, help this old man listening to all of this bother coming up. Yes, sir. Is the word BLEEP, B-L-E-E-P, is that an acronym or whatever you call it when it's a bunch of initials for something else? Or is that a name that somebody stuck on their product? That is the name they stuck on their product. It doesn't stand for anything else. Not that I'm aware of, Your Honor. All right. Thank you. My understanding is it's just what they called it, and they never had a working BLEEP. What do we do with their claims about the disclosure of the alleged secret documents? We dealt with – I understand what you want me to do with what the court to do on the contract, but what about their other claims? Would it be proper for the court to try those claims? No. Well, the court already did that and found against them on those. Okay. So that they're all – but to the extent the contract claim is really a claim about a disclosure of confidential information, do they get another bite of the apple on that? No. It's a de novo standard of review. The issues are purely legal. The facts aren't going to change. There's no way in the absence of a working product that ever existed they can recover on the contract. Both the Teletron case and the Animal Cracker case make clear that this case has to be reversed entirely on both the lack of a contract and the absence of any lost profits. They proved no other damages either and couldn't prove any causation because – and they didn't disentangle their expenses in trying to recreate this new software from what they were doing supposedly to complete our contract. So there's just no basis to award damages to them under any of their theories. Okay. Would we have to send it back for the court to consider attorney's fees for your client if it was determined there was not a contract? I think this court could say that we were to be awarded attorney's fees. I think the amount would probably have to be determined by the district court. And please, I'm not trying to foreshadow any ruling by the court. I'm just trying to – I made a chart with all the different pieces because it's so complicated. I'm just trying to figure out what happens. It is. I know. When you try to make something up out of nothing, it's really complicated. But that's what it distills down to is literally nothing. I guess your question is in the absence of any contract at all, could we get contractual attorney's fees? You wouldn't be entitled to them, so we wouldn't remand for those. I would have to look at that and give you a 28-J letter on it because I had not thought about that. Which is different than vacating the lost profits. Right, right. Definitely, under any theory, all of the lost profits, all the existing judgment has to be vacated. If the court were for any reason to find there is a contract, as a matter of law, they were the ones that terminated – I mean that breached. And we'd be entitled to – I think it was about $1.3 million in damages that we proved because of their breach. I mean we paid them over $482,000 for nothing, and we had substantial expenses in going to another system and paying converges to maintain our system while IDL was working on a new system to fix it. If we were to find that, we would remand for that to be tried though, right? No, that's already been proved too, and the record is sufficient, I think, to enter that finding as a matter of law. You know, I saw in a brief somewhere that IWS in an earlier motion said that the existence of a contract is undisputed, and the terms and conditions of the contract may be determined as a matter of law. We were asking the court if he did find there was a contract, he was going to have to determine the terms and conditions as a matter of law because they weren't there. I believe that was an alternative argument that was made early on in the case, but then that doesn't change what transverse actually proved to the jury, and the burden of proof was theirs. In the charge conference, I believe they even tried to shift the burden of proof to us to prove what the contract was and everything else, but the burden of proof was on them to prove all the material terms of the contract, including the time, the requisite performance, and to tender performance, none of which they did. Instead, they consistently said at trial that they had no obligation to perform whatsoever and that it was repeatedly they said it was just an agreement to agree, which this court said in the Animal Cracker case is not a contract. We asked the judge to rule on these issues as a matter of law so there would never be a trial. He said that he was just going to throw it all to the jury, which he did, and that he'd go back and sort it all out later, and then when he didn't do that, he said he'd let this court sort it out. So that's where we are. Okay. Thank you very much. Thank you. Okay. Mr. White. May it please the Court, I'm Raymond White. I'm the attorney for transverse. Mr. Jim Messer, transverse's CEO, is in the gallery, and Ms. Nellie Arobi and Blair Knox are with me. Your Honors, I will address several issues. One, the trial court's errors in vacating the jury's $9.3 million award on transverse's no action. Why don't you start off by telling us what evidence you presented in support of your argument that there was a contract? There was absolutely a contract, Your Honor. The contract, the BLEEP, by the way, stands for Business Logic Execution Environment Platform. It's an acronym. The parties signed a contract in June 2009. It's in evidence. It's plaintiff's Exhibit 1. I think it's Record Excerpt 7. The focus, the appellant has misconstrued our arguments on whether or not there was a contract. There was absolutely a contract. In the charge conference, they admitted it several times there was a contract. What constitutes performance of your client under the contract that you tell us exists? For developing a billing system that had substantially similar functions as their existing system. Your client did not develop a business billing system and, in fact, didn't get it off the ground at all, did it, under the undisputed facts? We did not develop a system. Your Honor, that's a different issue than whether or not there was a binding agreement as opposed to an agreement to agree. I can address both issues if you would like me to. The reason we didn't ultimately develop it, first of all, we had a system. We had sold the billing system, BLEEP, to a prior customer, Crossroads. One of their executives testified at this trial, Tim Riley, testified they used it. They operated it. It's a custom system. We have a core billing system which we customize for every customer. We were simply customizing our core system to them. But you didn't buy the code, license the code for this project so that you could customize this using the same that you'd use for Crossroads, correct? It was going to be licensed to them. That was part of the contract. The contract called for us to license the software to them for them to use the system. But the time of performance had already passed, and you still didn't have the code, and you didn't have a product. We hadn't finished it because for several reasons. One, they had not accepted it, which they could do without an agreement on what the acceptance criteria was. All they had to do was put it into commercial use. Wait a minute. You didn't have anything to put into commercial use, did you? Your Honor, we did. We had our core system, which they could access, and that's in the record, the testimony from Chris Couch. So they had a billing system. What they didn't have was the final customized system for them. But we did not have to finish it. So they could have put the billing system that you had into operation in their company? Yes, ma'am. And that's in the record? Yes, Chris Couch. They had access to our existing billing system. So did you say to the court during the charge conference that this was just an agreement to agree and you didn't need to have terms? No, absolutely not. Did you say anything of the sort about agreement to agree? Is this just a lie, a misquote? It's a mischaracterization of what I said. What did you say? I said the February 28 deadline, which is what they based their termination on. Their termination letter focused on the failure to meet the acceptance criteria by February 28. So the February 28 date was critical to their correct rightful termination and also to their counterclaim that we had breached. The problem they had was in order for that February 28 date to be relevant, there are other ways for them to accept under the contract. They're set out in paragraphs 8.5 and 8.6. This isn't the only way for them to accept it, and that's the critical thing. But for them to terminate on basis of February 28, they had to tell us what the acceptance criteria was. And there's testimony from Chris Couch and Jim Messer that we tried for three and a half months to get them to agree to the acceptance criteria. They wouldn't do it. We don't have any control over that. And then there's ample evidence in the record that they started intentionally not agreeing with us so they could push us past that deadline and claim breach, which is what the jury found implicitly. That they breached, we did not. The other reason why we didn't breach. So did you have a responsibility to provide a finished system ever under the contract or not? Absolutely. We did. Absolutely. And because the February 28 date was not a date to provide a finished working system. It was simply a date to satisfy the acceptance criteria. Chris Couch explains that in his testimony in the record. So you're saying you were developing a system and you had to have the criteria from the customer before you could go forward. Well, the acceptance criteria is to test to make sure the code meets what they want. And that's the February 28 date. That came and went because they wouldn't agree to it. There were other ways for them to accept. We didn't, and that's why. Wouldn't agree to what? What is it that they wouldn't agree to? I thought they didn't have anything to agree to. What is it that they didn't agree to? The UAT document, user acceptance test document. And what is that comprised of? That consists of the test standards to determine whether or not the code that we are developing, custom code off our core product, meets the acceptance criteria set out in the UAT document. It's sort of the final test. And once you pass that, then there are other things you have to do to get it up and running. But how could it possibly meet the UAT when it's not yet customized for the client? That's what the UAT is. That is precisely the customization that they have to tell us this is the acceptance standard to test it to. And when they don't agree to it, there's nothing we can do. For them to rely on the February 28 date, and by the way, if the February 28 date goes away, which it did, the law imposes a reasonable period of time for performance. The law cures the problem they're claiming. There's not an infinity, you know, absence of any deadline to perform. Was the performance date extended, in fact, to March the 15th or 16th or something like that? No, it wasn't because both sides agree in this case the contract was never amended. What happened was we finally did get an agreement on the acceptance criteria two weeks later, March 12th or March 13th. That's in the record excerpts as well. There's ample testimony of that from Jim Messer and Chris Couch. The other problem they have with the February 28 date is on February 12th we sent them a delay notice, explaining all the delays that they had caused and that the project was going to be delayed six to eight weeks. Under the contract, when we send a delay notice, we don't have to do anything until they agree to it. That's in the delay notice provisions of the contract. Did your company in February and March, the time period we're talking about, have authorization to use the general billing code that it had in its possession for this client? Did it have authorization to use this? Because I thought it had come from the other company's input. Did you have authorization to turn this billing system that you had used on the crossroads over to them? Could you have presented that to them? Was it properly licensed and ready to go to them? I don't know the answer. We had the license for crossroads. But you didn't have the license for them. So when you say we had the billing system already and we could give it to them as soon as we customized,  We weren't using crossroads for their system. Chris Couch testified that we had developed our new user interface, and that's all this was. You had your own code that you had developed from scratch through this reverse engineering. That's in the record? No. We developed our own user interface apart from open tabs, and Chris Couch testified it was finished. We completed it before we signed the contract with iWireless. That is a total red herring, Your Honor. We were not using the open tab software, and what we were using we had completed before we signed this contract. It was in our system. The agreement to agree is groundless because we had other ways for them to accept. We had a clear definition of what we were to develop. We had a product. We had sold it before. All of these arguments they're asserting, they argue to the jury. These are jury arguments. My learned colleagues may have some other questions about this, but I want you to talk about lost profits. Okay, which one? Well, we were awarded $10 million in lost profits on the termination claim. The $9.3 million award was on the other breach of contract claim, the no access claim. Does the court want to hear about the $10 million lost net profits? Is that what you're asking me about? I want to hear first on how you keep the lost profits you got before I hear how you get the lost profits you didn't get. Sure. The lost profits that we got are based on their wrongful termination, their breach of this contract. And it's based upon, first of all, it's based upon the testimony of our damage expert, the only damage expert in this case, Christopher Martinez, who looked at the contract. Following the contract, he calculated the revenue each year under the contract using the contract price and iWireless's own subscriber numbers, their own subscriber projections because the contract price was tied to how many subscribers they had. Okay. How in the world could there have been calculated revenue going forward when there had yet to be a product made and delivered? Isn't that speculative under the applicable law? I don't – no, Your Honor, it's not. I don't think it's any different from the DSC next level case that this court decided where that product was even newer than our product. That was a new radical product that the court found the damages were reasonable and non-speculative. Okay. Your product doesn't exist, didn't exist at the time. It did. It still doesn't exist. Well, the customized product for them didn't exist. The only reason we didn't make any profit from Crossroads is because they went into bankruptcy during the credit crunch in early 2009 and couldn't pay us. We were going to make a profit on that, but the absence of historical profits are relevant only when your damage model is claiming lost profits on future contracts. It's not relevant when you're trying to determine lost net profits on the contract in the case, the contract that was breached. But there's no product for the contract in the case. There was – because they terminated, we couldn't finish it. We were prevented from finishing the product. Their breach prevented us from doing that. Why was it reasonable to assume that they would continue to do business with you for many years to calculate out this? At the time where there is no product, how can the damages experts say that, oh, they're going to continue – they would have continued in this for 10 years or 20 years or whatever it is? I'd love to answer that. The contract – there are a number of factors to answer the court's question. The contract, first of all, was for 12 years. It had a two-year initial period, and it automatically renewed for five two-year renewal periods. It was subject to termination by either party. But if nobody did anything, it was on autopilot for 12 – Wasn't the action taken already by the opposing party a termination so that the maximum damages that could be would be two years lost profits? No, Your Honor. Because they – because the termination, that act, the act of termination, the jury found to be a breach. And under the law, you can't benefit from your wrongdoing. You can't benefit from your own breach. And the measure for damages is when there's a breach, common law measure, is you – what would – where would the plaintiff have been? Put the plaintiff in the position he would have been had the defendant performed. In other words, not terminate, not sent the wrongful termination. There's no reason for anyone to believe that they would have gone on more than two years given the fact that they had no product and they had no deadline. And there's no reason for a reasonable jury to believe they would have gone on beyond the two-year allowable termination date. Well, Your Honor, I believe there is ample evidence for a jury to determine that. And first of all, the reason – we were about – the testimony from Chris Couch was we were about a month or two away from completing this project. We were very close. Of course, we didn't have a final product because that's what happens when the defendant is found by the jury breaches. We can't continue. In fact, we did continue on our own because the contract required us to continue testing on our own if the other side stops working. And we did the first phase testing all on our own. Did you want to talk about why you should get those other lost profits? I wanted to ask you about the access to service. I read that clause. It says IWS shall not allow a competitor of transverse access to the service. And I won't read the rest of it, but I read that to mean access to the customized service that you had contracted to provide. And, of course, that was never provided. So I don't know how there could be any violation of confidentiality when it never was put in operation. Well, Your Honor, the service definitely includes the final product, no question about it. But the service has a three-page definition in the contract. And part of the definition includes the activities necessary to match their requirements to our product, to our system. That's part of the definition, and we cite that extensively in our brief. If you focus on that part, that's part of the definition of the service. That is exactly what these documents, these 30 meeting notes and the UAT document concern. That is we were meeting with them for five months to match their requirements with our system. The UAT document does that precisely. It's matching our system, our product, with their requirements. Remember, it's a custom product. It's not an off-the-shelf product. And Chris Couch testified, he's the chief technical officer, testified that both of those groups of documents, the 30 meeting notes and the UAT document, were documents to match the requirements of our wireless with our system. There's no controverting evidence of that at all. I mean, just reading the terms of the contract, though, it looks like monitoring, it's availability, performance, functionality. They're talking about something that's an active service. And that's absolutely part of the service, Your Honor. You're absolutely right that that's not all that the service is and the definition. And the point we made in our brief, Your Honor, when part of the definition of the service says to match their requirements with our product, that sentence makes no sense if it's only the final product because at that point you've already matched everything. You would make that sentence meaningless if it meant only the final product. And the trial court agreed with that construction and submitted the question to the jury properly. And the jury found by finding that they breached the no-access provision, the jury implicitly found that those documents, in fact, were factually part of the process of matching their requirements. Let me ask you this. I don't understand how you can recover net profits over the 12-year period, whatever the term was, and also recover expenses you spent to arrive at your net profit, the $1.7 million. Well, the reason for that, Your Honor, is there are two separate contract provisions, two separate breaches, and they resulted in two separate injuries. The termination claim, they wrongfully terminated the contract. The contract was the last 12 years under the Texas law we cite in our brief. That contract is construed for 12 years. And all the facts surrounding it, that's something the jury under the law has within the province of the jury to decide whether it reasonably would have lasted 12 years. That's a jury question. All right. But what I'm talking about is if you get your net profit, you can't also get your expenses. Well, here's the thing, okay? We got our net profit, and they are net. Christopher Martinez testified that he minused out the cost. That's on the wrongful termination. We lost those profits for 12 years. The $1.7 million expenses that we got instead of after the jury, you know, the judge took away the 9-3, are on the wrong giving a competitor access to the service. That's a separate injury because they got the benefit of our $8 million to $10 million in development costs, and they destroyed the value, half, 50% of the value, the secret part of the product. The most you can be done is made whole under the contract, so why don't you have to elect? We did. Well, between those two numbers? Well, they're two separate injuries, Your Honor. I don't think that presents an election. I know my time's out, but I'm going to answer the court. What is the election is between the 9-3 and the 1.7. If we had to, we couldn't get both of those, and we couldn't get the $10 million and the 1.7. We had to elect the reliance damages on those two different tract breaches, but between the two separate breaches and the two resulting injuries, there is no election because they're completely different injuries. Okay. Thank you, Mr. Twyford. Thank you, Your Honor. A piece of paper doesn't create a contract. They still have to have material terms for all of the provisions and tender performance to get any kind of breach of contract action, which obviously didn't happen. Page 6230, during the charge conference, Mr. White says it was undisputed that we didn't deliver a system by February 28. There was no system to deliver. They, meaning us, trying to shift the burden of proof to Iowa Wireless, have to show what the system was. That's a prerequisite. It's not a defense for us. Mr. Howitt, who was with Transverse, said he started to put in writing how bad things were. That's not the part of the quote, but he thought we might be tipping our hand to Iowa Wireless. We wouldn't want them to come to the realization we really don't know what we're doing or at least want them to get there slowly. That's at page 5870. Page 6231, but within the contract, the parties committed to agreeing to a subsequent agreement, and they didn't meet that. The contract involved more work beyond it in order to actually deliver a working system, which they have previously referred to as go live. The contract contemplates an agreement within that on what is to be satisfied, and that agreement never was. 6429 through 30, quote, Transverse had the right not to work, not to have to work, until the parties agreed to a controlling specification. But on the other hand, they admit that we or said that we agreed to the controlling specifications or UATs on March 13, 2010, at page 5146. With respect to the UATs, we wound up actually creating those ourselves when they couldn't get that done, and that's what they claim we wrongfully disclosed to IDI in an effort to get a working billing system. Everybody knew time was of the essence in this contract. It was crucial. The billing system was the lifeblood for Iowa Wireless. It's the only way the phone company could work and draw revenue was to have a working billing system. The Crossroads thing is a total red herring. Couch admits in his testimony it was based on the OpenTAP software, and they actually paid Crossroads, paid somebody from Crossroads who was a personal friend of Mr. Couch's, to give a reference to try to get IWS to go with the Transverse LEAP system. They did not relicense OpenTAPs. They might have given Iowa Wireless a license to use the BLEAP system, but there was no – they had completely jettisoned the OpenTAP software, and they state that repeatedly in the record. Why aren't they entitled to their lost profits if there is indeed a contract and a breach? Why aren't they entitled to the lost profits for the entire 12 years? They proved no profits at all. In fact, all they proved was they had consistently lost money over the years. How do you distinguish the DSC case, the case that was quoted by Kelson? I am drawing a complete blank on the facts of DSC at the moment, but I can assure the court that they do not meet the reasonable certainty standard for any measure of lost profits. Obviously, our termination letter is very clear. It's in our record excerpts. I think it's Record Excerpt 5. And we did give them a 30-day grace period before we terminated. They were supposed to mediate with us in good faith. We were trying everything to resolve it. Instead of mediating in good faith, they filed suit the day of the mediation at the conclusion of the day before the courthouse closed. And then they turned around and sued our employee, a lone employee in Iowa, which we just got dismissed on res judicata. So their only product that they ever created, frankly, was this lawsuit, and it doesn't hold water in any way, shape, or form. They totally abandoned the BLEAP software. They made no effort to get another customer for the BLEAP software after Iowa Wireless. It failed there. They never created a working product for anyone after they jettisoned open tabs. And without a history of profits and damages of reasonable certainty, they're entitled to no profits whatsoever. They also failed to disentangle their expenses in creating this new code from what they say was involved in this contract. In fact, I think it's Mr. Howitt that testified also that there was a lot of waste in the coding process for whatever they did manage to do. But all in all, the judgment must be reversed on all grounds, and I take nothing of judgment here. Thank you. Okay, thank you, counsel. We have your case.